**THE SEQUOIA LAW FIRM**
Melody L. Sequoia (309163)
530 Oak Grove Ave., Suite 102
Menlo Park, California 94025
Tel: (650) 561-4791
Fax: (650) 561-4817
melody@sequoialawfirm.com

Attorney for Plaintiff, on behalf of himself
And all others similarly situated

# UNITED STATES DISTRICT COURT

# NORTHERN DISCTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| CHRISTOPHER EAST, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EPIC ACTION, LLC, a Delaware Corporation and MACHINE ZONE, INC., a Delaware Corporation,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

Plaintiff Christopher East ("Plaintiff") files this Class Action Complaint against Epic Action, LLC and Machine Zone, Inc. ("Defendants"). Plaintiff brings this action based on personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the undersigned counsel.

## NATURE OF THE ACTION

1.  In 2016, Defendant Machine Zone, Inc. ("MZ") collaborated with the original maker of the popular Final Fantasy video game series to create a new mobile version of the game ("Final Fantasy XV: a New Empire") which contained the same storyline, images, and music as prior versions of the game, but could be played on a smartphone or tablet by gamers together in a

single online universe using MZ's technology. Through its subsidiary and agent, Epic Action, LLC ("Epic Action"), MZ released the game to the mobile market in June of 2017.

2. But in "re-skinning" the game and marketing it, MZ and Epic Action intentionally transformed the game into an exploitative monetized service. Among other things, Defendants introduced into the game an illegal money-making scheme that relies on false and misleading pop-up advertisements, coupled with design elements similar to casino play, to disguise the true cost of the gaming service until players are financially and psychologically invested.

3. Defendants' advertising and pricing scheme is predatory and unfair, and it harms consumers. Defendants' actions constitute unlawful, unfair, and fraudulent business acts or practices in violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200), false advertising in violation of California's False Advertising Law (Cal. Bus. & Prof. Code § 17500), and a deceptive act or practice under the California Consumer Legal Remedies Act (Cal. Civ. Code § 1770.)

4. Plaintiff, on behalf of himself and all others similarly situated seeks restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' illegal conduct, for declaratory and injunctive relief enjoining Defendants from continuing the unlawful practices set forth in this Complaint, and attorney fees and costs where applicable.

## THE PARTIES

5. Defendant Epic Action, LLC ("Epic Action") is a Delaware Corporation with its principal place of business at 1100 Page Mill Road, Palo Alto, California, 94304. Epic Action is a subsidiary company of Machine Zone, Inc. ("MZ") and was formed for the purpose of releasing the Final Fantasy XV mobile game to the market and providing gaming services to app users. Epic Action is the agent of its parent company, MZ. MZ has the same principal place of business at 1100 Page Mill Road in Palo Alto, California and MZ exercises control over nearly all aspects of Epic Action's current and future operations. MZ in November 2016 collaborated with the original maker of the Final Fantasy Video game series, Square Enix, to create a mobile spinoff version of the Final Fantasy game using MZ's technology. Through its subsidiary and agent, Epic Action, MZ released Final Fantasy XV in June of 2017.

6. Plaintiff Christopher East is a citizen of the State of North Carolina and a resident of Perquimans County. Since at least March of 2020, Plaintiff has owned and played Final Fantasy XV on his android mobile device. In the course of playing Final Fantasy XV, and as a result of Defendants' conduct, Plaintiff has been induced to spend money to purchase in-game "packs." Plaintiff estimates that from March 2020 to July 2020, he has spent in excess of $14,500 on in-game packs.

**JURISDICTION AND VENUE**

7. This Court has diversity jurisdiction over the claims asserted herein on behalf of a nationwide class pursuant to 28 U.S.C. § 1332, as amended in February 2005 by the Class Action Fairness Act. Jurisdiction is proper because:

    a. The proposed class includes more than 100 members and many of the class members are citizens of states that are diverse from the state of Defendants' citizenship, the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; and

    b. Defendants have purposefully availed themselves of the privilege of conducting business activities within the State of California.

8. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because a substantial part of the challenged conduct or omissions complained of herein occurred in this judicial district, and Defendants maintain their principal place of business in the United States in this judicial district.

**INTRADISTRICT ASSIGNMENT**

9. Pursuant to Civil L. R. 3-2(c), assignment to the San Jose Division is proper because a substantial part of the conduct which gives rise to Plaintiff's claims occurred in this district and specifically in Santa Clara County where Defendants reside.

///

# FACTUAL ALLEGATIONS

**Background and Gameplay of Final Fantasy XV**

10. Final Fantasy XV is an action role-playing mobile video game first released in June of 2017. The game is available on Android and Apple iOS platforms. The game is themed after the popular Japanese anthology science fantasy media franchise created by Hironobu Sakaguchi.

11. In November of 2016, the original maker of the Final Fantasy video game series, Square Enix (a Japanese Company), collaborated with Defendant MZ to develop, through its subsidiary Epic Action, a mobile spinoff version of the Final Fantasy game that combined the already-popular Final Fantasy name, music, and storyline with MZ's technology that allows millions of people around the world to play together in a single online universe in real time.

12. Final Fantasy XV is commonly referred to as a massively multiplayer online (MMO) role-playing game. MMOs are videogames that allow a large number of players to participate simultaneously over an internet connection. The game takes place in a shared online world, which the player can access after installing the application on their mobile smartphone or tablet through the online application purchase platform available to them (*i.e.*, the "App Store" for iphone users, the "Google Play Store" for android users, or the Amazon "Appstore" on Amazon tablets).

13. Generally, the object of Final Fantasy XV is to build an empire, defend it, and attack other players' empires.

14. An empire is made of up various structures or buildings that each provide a specific strategic benefit to the empire and to the player. There are over thirty buildings available to players in Final Fantasy XV that can be upgraded or "leveled up" using various virtual resources. The higher "level" building a player is able to obtain, the more useful that building is, and the more power the player has within the virtual environment. For illustrative purposes, the more well-known buildings within the game include the following:

   a. The central building in a player's empire is their "citadel." A players' citadel provides an overview of the empire's production and advancements and dictates what other buildings the player can build or upgrade.

  b. There are five different resource generation constructions from which to produce the resources needed to develop an empire—*i.e.*, a farm for producing food, an energy extractor for generating energy, a quarry for producing stone, a mine for generating metal, and a bank for producing "gil" (a virtual currency used in the game).

  c. Players may construct and upgrade a "university" building for researching the dozens of technologies to make the player's empire stronger and the resources needed to build those technologies.

  d. Players may build various kinds of training grounds to train troops, a watchtower to discover oncoming attacks, and physical walls for protection (which can be augmented with traps and other boosts).

15. In addition to constructing a physical empire, players can battle with other players in real time using various tiers of troops, "monsters," and gear, each with their own distinct advantage.

16. Final Fantasy XV is extremely popular.  As of January 2019, the game received more than 51 million downloads and has grossed more than $518 million worldwide ($165 million in the United States).

17. Final Fantasy XV has also been described by many as addicting because it is both easy to learn yet complex, utilizes casino style graphics and suspenseful music, and has a social element in which the game encourages players to join a "guild" to reap more benefits.

**The Virtual Economy of Final Fantasy XV**

18. Final Fantasy XV is part of a broad and growing class of online games which provide in-game services on a continuing revenue model.  Under that model, the game is free to download, but almost immediately users are encouraged to make in-game purchases, or microtransactions, which involve spending real money, usually in small amounts (but not always) to have access to certain features or services within the game.  Final Fantasy XV can be downloaded and in-game purchases can be made by anyone over the age of thirteen.

19. If a player chooses to make an in-game purchase, the credit card or bank account linked to the user's payment account associated with their mobile device (*i.e.*, App Store or Google

1  Play Store) is charged automatically.  Alternatively, the player may purchase Amazon coins, a form of digital currency, that can be used in lieu of real currency to buy in-game items.

20.  In Final Fantasy XV, the majority of in-game items and services are purchased in so-called "packs."  A pack consists of various virtual items and other benefits that can be used to enhance game play, including but not limited to: virtual currency (gold and/or gil); resources (energy, stone, metal, food); "boosts" or other "speed ups" that allow a player to reduce the time it takes to achieve a desired result; battle gear; and/or "chests."

21.  A "chest" is essentially a randomized chance to win other valuable in-game items designed to deliver additional value.  Unsurprisingly, the more valuable an item is, the less likely the player is to receive it from the chest.  The gamer does not know what assortment of items the chest actually contains until the pack is purchased and the chest is opened.  The chest mechanism relies heavily on the psychology of gambling by building up the player's hoped-for win, tension, and excitement.

22.  Making upgrades to a player's empire and army through the purchase of packs is critical in Final Fantasy XV.  Without purchasing these packs—which cost real money—players are unable to advance in the game and are easily defeated by other players who have made such purchases and upgrades.  The game is what is known in gaming parlance as a "pay to play" or "P2P" game.

**Defendants' Exploitation of their Virtual Economy through False and Misleading Advertising and Predatory Pricing**

23.  Since Final Fantasy XV was first made available to the public in mid-2017, and continuing to this day, Defendants have successfully exploited the above-described purchasing model to their benefit using false and misleading advertising, predatory pricing tactics, and gambling psychology designed to create and reinforce addictive behaviors.

24.  Initially, packs are sold to players for $4.99 by way of a "pop-up" advertisement. When a pop-up advertisement is sent to the player, it covers the entire mobile device screen, with casino-like bright lights and colors and suspenseful music. Players are given anywhere from three to thirty minutes to accept the offer.  Once a player purchases a number of less-expensive $4.99

packs to initially establish his or her empire and become invested or "hooked" on the game, the price of subsequent pack offers increases to $19.99, and then eventually to $99.99 and higher. Once a player purchases a $19.99 pack, he is rarely if ever are offered a $4.99 pack again. Similarly, once a player purchases a $99.99 pack, he is rarely if ever offered a $4.99 or $19.99 pack.

25. In almost all instances, the packs purchased do not actually provide the item or service advertised, forcing players to buy additional packs—at increasing costs—to achieve the items or results originally advertised.

26. For example, players receive advertisements for packs that ostensibly allow the player to upgrade the buildings in their empire in exchange for real money. An example of one such advertisement (the "Upgrade Pack") is shown below and reproduced as **Exhibit A** hereto:



27. Plaintiff read the same or substantially similar representations reflected in the above Upgrade Pack and purchased it in July of 2020.

28. As reflected in the advertisement above, players (including Plaintiff) were led to believe that in purchasing this $99.99 Upgrade Pack, they will be able to "level up" or "upgrade" their citadel, thereby increasing their power within the game.

29. In reality, purchasing this Upgrade Pack does not result in a citadel upgrade at all. The listed items underneath the large lettering are only *part* of what is needed to upgrade. To discover what is actually needed to upgrade, users must exit out of the advertisement, enter their "university" building within their empire, and "research" the dozens of resources needed to upgrade. Doing that "research" is near impossible given that the advertisement contains a live countdown clock, usually only a few minutes in length, pressuring the player to make the purchase quickly and without exiting out of the ad. Nothing in the advertisement discloses to players what is actually needed to upgrade. Nor is there any link contained in the advertisement that allows the player to go directly to that information. Instead, players are led to believe that the items listed, if purchased, will allow them to upgrade their citadel, which is patently false.

30. In addition, players will often receive advertisements for packs that ostensibly allow the player to perform certain actions within the game in exchange for real money. An example of one such advertisement (the "Monster Pack") is shown below and reproduced as **Exhibit B** hereto:




31. Plaintiff read the same or substantially similar representations reflected in the above Monster Pack and purchased it on more than one occasion in June of 2020.

32. The image to the left is an advertisement for a pack that purports to "Unlock Monsters in the Monster Pen" in exchange for real money. Unlocking monsters is an offensive move by a player in which the player unleashes monsters, which in turn attack another player's empire.

33. Players are led to believe that in purchasing this $99.99 Monster Pack, they will obtain all the materials required to "unlock" their monster pen, including but not limited to a "Rare Chocobo Monster Champion Egg."

34. In reality, the Monster Pack above very rarely, if ever, contains a Chocobo Monster Champion Egg and other items needed to unlock monsters. Plaintiff is aware of players who purchased ten or more Monster Packs and never received the egg needed to achieve the advertised action. That is because the Monster Pack only provides *some* resources needed to unlock monsters, and various chests, which are simply randomized *chances* of obtaining certain items (some of which are needed to unleash monsters and some of which are not). Adding to the false and misleading nature of this advertisement, the Monster Pack purports to provide 20 "Chocobo Monster Champion Egg Chest[s]," leading the player to believe that by purchasing this pack, they will receive (or at least have a chance of receiving) a Monster Champion Egg. But, as reflected in the image to the right above, a Chocobo Monster Champion Egg Chest overwhelmingly contains other resources (*i.e.*, hatching stone), and does not appear to contain any Chocobo Monster Champion Egg.

35. Players also receive advertisements for packs that will allow the player to obtain certain battle gear in exchange for real money. An example of two such advertisements are below and reproduced as **Exhibit C** hereto:

///

 

36. The image to the left (the "Hunter Gear Pack") is an advertisement for a pack that purports to give the player "bonus hunter gear" that can be used when battling other players.

37. Plaintiff read the same or substantially similar representations reflected in the above Hunter Gear Pack and purchased it in May of 2020.

38. Similarly, the image to the right (the "Legendary Gear Pack") is an advertisement for a pack that purports to give the player "legendary" battle gear. Plaintiff read the same or substantially similar representations reflected in the above Legendary Gear Pack and purchased it on more than one occasion in July and August of 2020.

39. Players are led to believe that in purchasing the Hunter Gear Pack for $99.99, they will "get the best monster attacking gear **now**!" (emphasis added). Similarly, Players are led to believe that in purchasing the Legendary Gear Pack for $99.99, they will receive certain legendary gear of their choosing.

40. In reality, these packs do not give the player any gear at all. Instead, players purchase *some* of the materials needed, and various chests, which are simply randomized *chances* of obtaining certain materials. Plaintiff has never bought a gear pack where he received all of the

1  material he needed to get the advertised gear. Players are forced to buy multiple packs to obtain the resources needed for the promised items. As with the Upgrade Pack, to discover what is actually needed to obtain the gear advertised, users must exit out of the advertisement, enter their "university" building within their empire, and "research" the dozens of resources needed to obtain the gear. Nothing in the advertisement discloses to players what is actually needed to obtain the gear. Nor is there any link contained in the advertisement that allows the player to go directly to that information. Instead, players are led to believe that the items listed, if purchased, will allow them to obtain the advertised gear, which is patently false.

41. There are dozens, if not hundreds, of packs that are substantially similar to the above-described packs available to Final Fantasy XV players.

42. And while in-app purchasing models are becoming increasingly common in the gaming industry, Defendants in-app purchasing model, which relies on false and misleading advertising, gambling psychology, and unfair marketing and pricing models, violates California law and harms consumers.

**CLASS ACTION ALLEGATIONS**

43. Pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks certification of a nationwide class consisting of:

> All persons who purchased an Upgrade Pack, Monster Pack, Hunter Gear Pack, or the Legendary Gear Pack within Final Fantasy XV

44. The Class excludes Defendants' officers and directors, current or former employees, including their immediate family members, as well as any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff. Plaintiff reserves the right to amend the Class definition or include subclasses if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

45. The members of the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class members in a single action will provide substantial benefits to the parties and to the Court.

46. Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all other members of the Class were damaged by the same wrongful conduct committed by Defendants, as alleged more fully herein.

47. Plaintiff will fairly and adequately protect the interests of the Class. The interests of the Class representative is coincident with, and not antagonistic to, the interests of the members of the Class.

48. Questions of law and fact common to the members of the Class are central here and predominate over questions that may affect only individual members. Among the questions of law and fact common to the Class are:

    a. Whether Defendants violated Business & Professions Code § 17200 by engaging in an "unlawful" business practice by virtue of their violation of state and federal law in connection with their deceptive advertising and pricing scheme, as set forth herein;

    b. Whether Defendants violated Business & Professions Code § 17200 by engaging in an "unfair" business practice by disguising or withholding important information concerning the true long-term cost of gaming activities until players are financially and psychologically committed;

    c. Whether Defendants violated Business & Professions Code § 17200 by engaging in a "fraudulent" business practice by marketing videogame services in such a way that is likely to deceive members of the consuming public;

    d. Whether Defendants violated Business & Professions Code § 17500 by making untrue or misleading statements in advertising;

    e. Whether Defendants violated Civil Code § 1770(a)(5);

    f. Whether Defendants violated Civil Code § 1770(a)(7);

    g. Whether Defendants violated Civil Code § 1770(a)(9);

    h. Whether Defendants were unjustly enriched as a result of the conduct alleged herein; and

    i. Whether Defendants' conduct violated other provisions of statutory and common law outlined in this Complaint.

49. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. The burden and expense that would be entailed by individual litigation makes it impracticable or impossible for Class members to prosecute their claims individually. Further, the adjudication of this action presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Violation of California's Unfair Competition Law ("UCL")**
**California Business & Professions Code § 17200, *et seq.***
**Against Defendants Epic Action and MZ**

50. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of the Complaint.

51. Plaintiff and Defendants are "persons" within the meaning of the UCL. Cal. Bus. & Prof. Code § 17201.

52. The UCL defines unfair competition to include any "unlawful, unfair, or fraudulent business act or practice," as well as any "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

53. By committing the acts and practices alleged herein, Defendants have engaged in unlawful, unfair, and fraudulent business acts and practices in violation of the UCL.

54. ***Unlawful conduct***: As a result of engaging in the conduct alleged in this Complaint, Defendants have violated the UCL's proscription against engaging in unlawful conduct by virtue of their violation of state and federal law in connection with their deceptive advertising and pricing scheme.

55. More specifically, Defendants have violated the UCL's proscription against engaging in "unlawful" business practices by virtue of their conduct in violation of the Federal Trade Commission Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements (15 U.S.C. § 52(a)). In addition to federal law, Defendants have violated California

Civil Code §§ 1710 and 1711, and, as set forth in Counts two and three below, California's False Advertising Law (Bus. & Prof. Code § 17500) and the Consumer Legal Remedies Act (Cal. Civ. Code § 1770(a)(5), (7), and (9)).  Plaintiff reserves the right to allege other violations of law, which constitute other unlawful business acts or practices.  Such conduct is ongoing and continues to this date.

56. **Unfair Conduct**:  A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

57. In the course of conducting business, Defendants have violated the UCL's proscription against "unfair" business practices by, among other things,

   a. Engaging in the conduct alleged in this Complaint, which is illegal and violates legislatively-declared policies articulated in the FTCA and California's False Advertising Law against false or misleading advertising;

   b. Disguising or withholding important information concerning the true long-term cost of gaming activities until players are financially and psychologically committed; and

   c. Intentionally profiting from conduct designed to create and/or exploit addictive tendencies in gamers.

58. There is no societal benefit from Defendants' conduct—only harm to consumers.  Defendants have engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers, and the gravity of Defendants' conduct outweighs any alleged benefits attributable to such conduct.

59. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

60. **Fraudulent Conduct**:  A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

61. Defendants' acts and practices alleged above constitute fraudulent business acts or practices because they have deceived Plaintiff and are highly likely to deceive members of the consuming public. Plaintiff relied on Defendants' fraudulent and deceptive representations regarding its advertised Upgrade Pack, Monster Pack, Hunter Pack, and Legendary Gear Pack. Those representations played a substantial role in Plaintiff's decision to purchase these Packs, as well as other packs, and Plaintiff would not have made these in-game purchases without Defendants' representations.

62. ***Unfair, deceptive, untrue or misleading advertising:*** Defendants' advertising of its packs constitutes unfair, deceptive, untrue, or misleading advertising under the UCL.

63. Advertising is misleading under the UCL if members of the public are likely to be deceived.

64. As set forth above, the above-described packs were communicated to Plaintiff and the Class members, and the advertisements are likely to mislead a reasonable person into believing that the promised upgrade, action, and/or gear would be provided to them if they purchased the pack for the advertised price.

65. Defendants' misleading marketing and advertising were conceived, reviewed, approved, or otherwise controlled from Defendants' headquarters in California.

66. Defendants' violations of the UCL continue to this day. As a direct and proximate result of Defendants' violations of the UCL, Plaintiff and members of the Class have suffered actual damage by spending money on packs and subjecting themselves to the unlawful, exploitative games as alleged herein.

67. Unless restrained and enjoined, Defendants will continue to engage in the unlawful, unfair, and fraudulent conduct described herein.

68. Pursuant to Section 17203 of the UCL, Plaintiff and the Class seek an order that requires Defendants: (i) to cease this unfair competition, (ii) to provide Class members with restitution for monies paid to purchase the Upgrade Pack, Monster Pack, Hunter Gear Pack, and Legendary Gear Pack described above, (iii) to otherwise make full restitution of all monies wrongfully obtained from their violations of the UCL, as alleged in this Complaint, and (iv) to pay

the attorney fees and costs incurred by counsel for Plaintiff and the proposed Class, including in accordance with California Code of Civil Procedure § 1021.5.

### SECOND CAUSE OF ACTION

**Violation of California's False Advertising Law ("FAL")**
**California Business & Professions Code § 17500, *et seq*.**
**Against Defendants Epic Action and MZ**

69. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of the Complaint.

70. California Business and Professions Code § 17500 broadly proscribed "untrue or misleading statements in advertising" in connection with the performance of services.

71. Defendants provide a service to consumers in which consumers sign up for accounts on a web-based platform, maintained by Defendants, where they can engage in gaming activities.

72. In connection with the performance of those services, Defendants intended to and did make untrue and misleading statements in advertising in violation of the FAL. Defendants' advertisements of packs to players contain untrue or misleading statements under the FAL because the statements made in the Upgrade Pack, Monster Pack, Hunter Gear Pack, and Legendary Gear Pack have deceived Plaintiff for the reasons detailed above, and are likely to deceive members of the public.

73. Plaintiff and the Class suffered injury in fact as a result of Defendants' actions as set forth herein because Plaintiff purchased the above packs in reliance on Defendants' false and misleading claims.

74. Defendants have profited from their sales of falsely and deceptively advertised packs to unwary customers.

75. As a result, pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff and the Class are entitled to injunctive relief and equitable relief and restitution.

///

**THIRD CAUSE OF ACTION**
**Violation of California's Consumer Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq.***
**Against Defendants Epic Action and MZ**

76. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of the Complaint.

77. This claim for relief is brought pursuant to the CLRA. The CLRA was enacted to protect consumers against unfair and deceptive business acts or practices and methods of unfair competition. It extends to transactions that are intended to result, or which have resulted in the sale of goods or services to consumers.

78. Defendants provided services to Plaintiff and members of the Class within the meaning of California Civil Code § 1761(b). Plaintiff and the Class members have signed up for accounts on a web-based platform, maintained by Defendants, where they can engage in various online gaming activities.

79. Plaintiff and the other members of the Class are consumers within the meaning of Cal. Civ. Code § 1761(d).

80. Defendants' acts, omissions, misrepresentations, and practices were designed to, and did, induce the purchase of Defendants' services for personal, family, or household purposes by Plaintiff and the Class members, and violated and continues to violate at least the following sections of the CLRA:

   a. § 1770(a)(5): representing that services have characteristics, uses, or benefits that they do not have;

   b. § 1770(a)(7): representing that services are of a particular standard, quality, or grade if they are of another;

   c. § 1770(a)(9): advertising services with intent not to sell them as advertised.

81. Defendants' unlawful practices, detailed above, occurred at Defendants' headquarters in California.

82. Defendants' violations of the CLRA proximately caused injury in fact to Plaintiff and the Class.

83. Pursuant to Cal. Civ. Code § 1782(d), Plaintiff, individually and on behalf of the other members of the Class, seeks a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

84. Pursuant to Cal. Civ. Code § 1782(a), Defendants were notified in writing by certified mail of the particular violations of Section 1770 of the CLRA, which notification demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected customers of Defendants' intent to so act. A copy of the letter is attached as **Exhibit D**.

85. If Defendants fail to rectify or agree to rectify the problems associated with the actions detailed above and give notice to all affected consumers within 30 days of the date of written notice pursuant to § 1782 of the Act, Plaintiff will amend this Complaint to add claims for actual, punitive, and statutory damages, as appropriate.

86. Defendants' conduct is fraudulent, wanton, and malicious.

87. Pursuant to §1780(d) of the Act, attached hereto as **Exhibit E** is the affidavit showing that this action has been commenced in the proper forum.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**Against Defendants Epic Action and MZ**

88. Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

89. By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Plaintiff and the Class. Defendants were unjustly enriched as a result of the compensation they received from the marketing and sale of the unlawful and unfair packs to Plaintiff and the members of the Class.

90. Plaintiff and the Class seek restitution from Defendants and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

91. Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief in this Complaint as follows:

    a.    For an order certifying the Class as requested herein;

    b.    For restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

    c.    For declaratory and injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein;

    d.    For an award of attorney fees, where applicable;

    e.    For an award of costs; and

    f.    For any and all other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Based on the foregoing, Plaintiff, on behalf of himself, and all other similarly situated, hereby demands a jury trial for all claims so triable.

Respectfully submitted,

Dated: October 23, 2020            **THE SEQUOIA LAW FIRM**

By:    /s/ Melody L. Sequoia
        Melody L. Sequoia, Esq.

530 Oak Grove Ave., Suite 102
Menlo Park, CA 94025
Tel: (650) 561-4791
Fax: (650) 561-4817
melody@sequoialawfirm.com

*Attorney for Plaintiff*